# United States District Court

MAR 2 3 2005

EASTERN DISTRICT OF CALIFORNIA

U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

All Israel Military Industries receivers in various states of marking/assembly.

**APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

**SEALED**

CASE NUMBER:

SW- 05 - 0075 KJM

I   Donna M. Hauser, ATF   being duly sworn depose and say:

I am a(n)   Special Agent, ATF   and have reason to believe

that in the   EASTERN   District of   CALIFORNIA

there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

All Israel Military Industries receivers in various states of marking/assembly.

which is (state one or more bases for seizure under the United States Code)

forfeitable pursuant to 18 U.S.C. § 924(d)(1) and subject to seizure pursuant to 18 U.S.C. § 3051(c), incorporating 19 U.S.C. § 1603(a).

concerning a violation of Title   18   United States Code, Section(s)   922(m), 923(i) 924(a)(1)(D), and 924(a)(3)(B).

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

See attached affidavit.

Continued on the attached sheet and made a part    [X] Yes   [ ] No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

3/22/05                              at    Sacramento, California
_____        _____
Date                                    City and State

Kimberly J. Mueller, U.S. Magistrate Judge          _____
_____                     Signature of Judicial Officer
Name and Title of Judicial Officer

<u>A F F I D A V I T</u>

I, Donna Hauser, being duly sworn, depose and state that:

STATEMENT OF VIOLATIONS

1. I am a Special Agent for the U.S. Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed in the state of California since 1999. Prior to that, I was an Inspector for ATF for eight years. As a result of my training and experience as both a Special Agent and as an Inspector, I am knowledgeable with federal firearms laws and regulations, and know that it is unlawful and a violation of:

   Title 18, U.S.C., Section 924(a)(1)(D) makes it a crime for any person to willfully violate any provision of Chapter 44, which incorporates Title 18, Sections 922, 923, and 924. Title 18, U.S.C., Section 924(a)(3)(B) makes it a crime for any licensed importer to knowingly violate subsection (m) of section 922.

I further know that:

   Title 18, U.S.C., Section 922(m) provides that it is a violation for any licensed importer to knowingly make any false entry or fail to make appropriate entry in respect to the information required to be kept in the records of a person licensed under Title 18, U.S.C. Chapter 44.

   Title 18, U.S.C., Section 923(i) provides that any licensed importer of firearms shall identify, by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported by such importer.

   Title 18, U.S.C., Section 921(a)(3) defines the term "firearm" to include the "frame or receiver."

   Title 18, U.S.C., Section 923(g)(1)(A) provides that each licensed importer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary shall by regulations prescribe.

1

Title 18, U.S.C., Section 923(g)(7) provides that each licensee shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Secretary for information contained in the records to be kept by this chapter as may be required for determining the disposition of one or more firearms during the course of a bona fide criminal investigation.

These aforementioned regulations are described further in Code of Federal Regulations, Sections 478.92(a)(1), 478.112(d), 478.122(a), and 478.125(e), which state, in part that any licensed importer must, within fifteen days, legibly identify each imported firearm by means of a conspicuously placed set of markings that are not susceptible of being readily obliterated, altered, or removed, and which identify the serial number of the firearm, as well as the model (if applicable), the caliber or gauge, the country of manufacture, and the name, city, and state of the importer of the firearm; and record such information within the time specified and in the records required by Chapter 44 to be kept by a licensed importer.

2. This affidavit is based, in part, on discussions I have had with ATF Inspector Roger Root. Inspector Root has been employed with ATF Industry Operations for approximately three and one-half years, in which time he has completed over fifty inspection assignments specifically focused on firearms industry members and their compliance with Federal law and regulations.

## BASES FOR SEIZURE AND FORFEITURE

3. Title 18, U.S.C. Section 924(d)(1), provides that any firearm involved in or used in any knowing violation of Section 924, or willful violation of chapter 44, including a violation of Section 923(i), or any rule or regulation promulgated under such chapter, shall be subject to seizure and forfeiture. Seizures under any provision of law enforced or administered by the Bureau of Alcohol Tobacco, Firearms and Explosives are governed by 18 U.S.C. § 3051(c). That provision incorporates the Customs laws relating to seizures, including 19 U.S.C. § 1603(a). Section 1603(a) provides that property that is subject to forfeiture may be seized by the appropriate officer or person upon process issued in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.

2

PROPERTY TO BE SEARCHED

4. This affidavit is made in support of an application for a search warrant and a seizure warrant for the premises located at 2215 J Street, Sacramento, California, which is more particularly described in Attachment A, which is incorporated herein by reference.

5. The items to be searched for and seized for forfeiture are particularly described in Attachment B, which is incorporated herein by reference.

6. The items to be searched for and seized as evidence are particularly described in Attachment C, which is incorporated herein by reference.

BASIS FOR PROBABLE CAUSE

7. Federal firearms licensees, including federally licensed importers, are required to keep records of acquisition and disposition of firearms as defined by Title 18, U.S.C., Chapter 44. The format and time frame in which these records must be kept are further defined in Title 27 of the Code of Federal Regulations (CFR). The purpose behind Title 18, U.S.C., Chapter 44, and Title 27 of the CFR is "to provide for the better control of the interstate traffic in firearms" and "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." This purpose is accomplished by giving law enforcement the capability, through records maintained by federal firearms licensees, to quickly and accurately trace firearms that have been recovered as part of a criminal investigation.

8. Federal firearms importers are therefore required to mark imported firearms with the importer's name as per Title 18, U.S.C., Section 923(i) and 27 CFR 478.92(a)(1). This requirement is critical, as the manufacturer or importer is the first step in starting any trace of a firearm recovered in a crime. Without a mark indicating who imported a firearm, the firearm is virtually untraceable, as law enforcement has no starting point from which to begin the trace. To further assist law enforcement in tracing a firearm, Title 18, U.S.C., Section 923(g)(7) requires that each licensee must respond immediately (within 24 hours) to any request by the Secretary for information related to the

acquisition/disposition of firearms in the course of a bona fide criminal investigation.

9. 27 CFR 178.11 defines a firearm as "[a]ny weapon…which will or is designed to or may be readily converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearms silencer; or any destructive device…." [emphasis added]

10. 27 CFR 178.125(e) requires that all acquisitions and dispositions of firearms be kept in a bound record. It further requires that all acquisitions be recorded not later than the close of the next business day and that dispositions be recorded not later than seven days following the date of such transaction. The information to be included in this record includes the manufacturer and/or importer name, the model, serial number, type, and caliber/gauge of the firearm acquired, as well as the date and the name and address of the entity from whom it was acquired, and the date, name, and address or license number (if recipient is a federal firearms dealer) of the person to whom the firearm is transferred.

11. The information contained in this affidavit is based upon an inspection conducted by ATF Inspectors at New Helvetia Mercantile Corporation (NHM CO) on January 12, 2005. This corporation is part of a group of two federal firearms licensees that operate under a parent company called New Helvetia Trade Group. Both licenses are held at 2215 J Street, Sacramento, California, and are managed by Edward Louis Faust. NHM CO obtained its license as a federal importer in 1971, and has maintained the license continuously to the current date.

12. During the inspection of NHM CO, a large number of firearms receivers were discovered which had been imported in 2000 and 2001 from Israel Military Industries, a firearms manufacturer in Israel. Four of these firearms were found in the shipping area, in a clear plastic bag with the words "no serial numbers" printed on it. When Mr. Faust was questioned about these receivers, he stated that they were supposed to have the serial numbers engraved on them prior to being shipped out.

13. The inspectors then examined the receivers still in inventory, and determined that approximately 3,134 receivers which had been imported in 2000 and 2001 from Israel Military Industries did not have one or more of the markings required by

4

Code of Federal Regulations, Chapter 44, Section 478.92(a)(1). In addition, many of the receivers that initially appeared to be in compliance with this Section actually bore the importer markings of an out-of-business importer, "Action Arms." Although all the receivers had ultimately been imported by NHM CO, none of them bore NHM CO's importer markings.

14. It was further discovered that NHM CO had sold approximately 168 of the receivers that had been imported from Israel Military Industries in Israel in 2000 and 2001, which had been placed into kits with all the parts necessary to manufacture complete firearms, to other firearms dealers and wholesalers. Faust was questioned about these receivers, and he stated that he had not placed his importer markings on them prior to transferring them. All 168 of these firearms, consequently, bear the inaccurate importer markings of Action Arms, which not only renders them untraceable but will also serves to mis-direct any trace to an importer who is no longer in business.

15. Faust admitted to Inspector Root that he (Faust) was aware of the requirements to place his importer markings, in Faust's words, "immediately" on the receivers, and he stated that he would comply with any request to "make things right." Faust also offered to send the receivers to a licensed firearms manufacturer in Nevada to have them marked. Faust gave no reason why the firearms had not been properly marked. Inspector Root told Faust to discontinue sales of the kits until such time as a determination was made in regard to the receivers.

16. On February 2, 2005, ATF Inspectors returned to NHM CO on an unrelated matter. They observed that employees of NHM CO were hand stamping a small mark on the side of the receivers in question. This marking indicated the importer as NHM CO, but did not appear to meet the requirement of a conspicuous and permanent mark as defined by Code of Federal Regulations, Chapter 44, Section 478.92(a)(1). Mr. Faust was questioned about the actions of the NHM CO employees, to which he replied that he was trying to "make things right."

17. Inspector Root examined the acquisition and disposition records for NHM CO. Inspector Root counted "open entries" (i.e, an acquisition entry with no corresponding disposition entry, which indicates the firearm is still in inventory) with physical inventory, and found a total of approximately 888 entries. However, only 432 firearms could be found that corresponded to

5

these entries. 456 open entries could not be matched to a firearm, indicating that the firearms had been disposed of with no disposition information. In addition, 137 firearms were found in physical inventory, with no corresponding entries found in the acquisition record.

18. From January 1, 2000, through December 1, 2004, NHM CO received approximately 132 trace requests. A trace history report obtained through ATF's Crime Gun Analysis Branch as part of the recent inspection disclosed that NHM CO was not able to accurately respond to 76 of these trace requests, or approximately 58% of the requests received. Inspector Root determined that when NHM was contacted regarding a trace, its employees would often respond by falsely stating that NHM CO never recorded a serial number similar to the one being traced. Through further investigation of supplemental business records, Inspector Root was able to determine that at least 22 of the firearms in question had been acquired by Faust in the past, and subsequently transferred to other licensees.

19. NHM CO is a dealer in Title II firearms, which are controlled under the National Firearms Act (NFA); i.e, machine guns, silencers, etc. These firearms are strictly controlled, and transfer paperwork must be completed any time such firearm is moved from one individual to another. An inventory of firearms held by NHM CO, provided by the ATF NFA Branch, disclosed that NHM CO should have ten NFA firearms. Of the ten listed, NHM CO could only locate seven. Faust was questioned about the missing three NFA firearms, and he stated that he was not aware that two of them had ever been transferred into his possession. He did not have an explanation for the third firearm. In addition, NHM CO had possession of two Title II firearms that were not listed on the NFA Branch inventory. When questioned about these two firearms, Faust stated that "these might be trouble." He could not provide any documentation regarding their registration. When Inspector Root returned at a later date and asked Faust to surrender the two firearms, Faust stated that he had already surrendered them to the California Department of Justice (DOJ). DOJ Agent Ignacious Chin was then contacted about the firearms. He stated that Faust told him he did not want the firearms in his store due to an ATF audit being conducted.

20. The licenses held under the parent company of New Helvetia Trade Group have been inspected numerous times over the years by ATF. A history of non-compliance with ATF laws and regulations

has been established through these inspections, as most have disclosed violations - many times recurring violations - in the licensees' records. Specifically, in 1993, NHM CO was cited for identical violations as some of those noted in subsequent inspections, including the inspection in 2005. In 1993, NHM CO was cited both for serious record-keeping violations and for failing to properly mark imported firearms. At this time, NHM CO was issued a warning letter, and these violations were discussed with Edward Faust.

21. Faust's FBI criminal history record indicates that, on or about October 1981, Faust was arrested and convicted in Macon, Georgia, for violation of Title 18, U.S.C., Section 2232, conspiracy to remove firearms from a foreign trade zone to prevent lawful seizure. He was subsequently sentenced to two years probation and a fine of $2,000. He was convicted again in 1982 for violation of Title 15, Code of Federal Regulations, Part 387.8, permitting an export contrary to an import control document, and was given a suspended sentence, but was required to pay a $25,000 fine.

## ITEMS TO BE SEIZED

22. As a result of the reporting and record retention requirements of Chapter 44 it is expected that at any licensed premises, the federal licensee will have a bound record of acquisitions and dispositions, as required by 27 CFR 478.125(e). In addition to this record, as per 27 CFR 478.122(b) and 478.129(d), any federal importer must, by law and regulation, maintain, on its licensed premises, permanent records of importation or other acquisition of firearms, and must also maintain records of disposition of firearms for a minimum of twenty years. If the licensee fails to record acquisitions by the close of the next business day, it is also required to maintain, in a format "readily available for inspection on the licensed premises", commercial invoices of firearms received, as per 27 CFR 478.125(g). In addition to these required records, licensees also typically maintain supplemental purchase and sales invoices through which they can audit their acquisition and disposition records.

23. NHM CO has applied for and received from ATF a variance from the record-keeping requirements. This variance allows NHM CO to keep its records of acquisition and disposition on computer, as opposed to a manual bound record. ATF Inspector Root noted

during his inspection that NHM CO does not take advantage of this variance and still keeps its acquisition and disposition record manually; however, sales and purchase invoices, which would be used to supplement and support the manual record, are computerized.

24. I know that computers kept at businesses are commonly used to research and store information related to an individual's interests, including information related to manufacturing and acquisition of illegal items. These computer records may be protected either by computer encryption or password. Further, I am aware that it is possible to "hide" a file so it does not appear on the computer's directory without the use of a password or special software to make the file "readable" again.

25. In the past, I consulted with then-ATF Special Agent Anthony S. Costakis regarding the aspects of properly retrieving and analyzing electronically stored computer data. I am informed and believe that Special Agent Costakis was formerly employed by ATF from approximately June of 1990 through 2003. Currently, he is Assistant Special Agent In Charge for the General Services Administration in San Francisco, and continues to work on computer forensics. Special Agent Costakis has attended the U.S. Treasury Computer Investigative Specialist (Seized Computer Evidence Recovery) school at the Federal Law Enforcement Training Center in Glynco, Georgia, where he learned about the operation of computer systems and the correct procedures for seizure and analysis of computer systems.

26. Based on his knowledge and training, Special Agent Costakis has advised me that to properly retrieve and analyze all electronically stored (computer) data, to document and authenticate such data and to prevent the loss of data either from accidental or deliberate programmed destruction requires on site and laboratory analysis by a qualified computer specialist. To effect such accuracy and completeness may require the seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords and decryption keys), and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is because the peripheral devices, which allow users to enter or retrieve data from storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order

to read the data on the system. It is important that the computer system be re-configurable to accurately retrieve the evidence.

27. A Computer Investigative Specialist will conduct a search of the computer(s) for relevant data. The Computer Investigative Specialist will employ techniques to assure that only the items authorized by the warrant will be searched and seized and to protect the integrity of the records. If, for technical reasons or volume of evidence, the Computer Investigative Specialist cannot conduct the search on-site, authorization for removal of the system is requested. If, after inspecting the input/output devices, software, documentation and data security devices, the Computer Investigative Specialist determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them.

28. As part of his search of the computer system and peripherals, the Computer Investigative Specialist may need to make a mirror image copy of the hard drive(s), backup media, floppy diskettes, disk cartridges, CD-ROMS, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks on which data was stored.

29. A mirror image copy is an exact copy of the storage media. This is necessary to accurately reproduce the documents on the storage devices and to preserve the integrity of the data. The search will then be conducted using the mirror image copy. Permission is requested for the Computer Investigative Specialist to make a mirror image copy of the above storage media and conduct a search of the computer systems, hardware, software, and backup media for the specific items described in this Affidavit and Attachment C.

30. Special Agent Costakis has informed me that the Computer Investigative Specialist will provide the investigating agent(s) only those documents and evidence which are set forth in this Affidavit.

31. The term "records", "documents", and "materials" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including, but not limited to any handmade form (such as writing, drawing, painting,

9

with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures and photocopies); any electrical, or magnetic form (such as tape recordings, cassettes, compact disks); and/or any information on an electronic or magnetic storage device (such as floppy diskettes, hard drives, backup media, disk cartridges, CD-ROMS, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks); as well as printouts or readouts from any magnetic storage device.

## CONCLUSION

32. Based on the above information, I have probable cause to believe that NHM CO has violated Title 18, United States Code, Sections 922(m), 923(g), 923(i) and 924(a)(1)(D) and 924(a)(3)(B) in its possession firearms and firearms receivers that are not marked or recorded in accordance with Title 18, U.S.C., Sections 923(i) and which are therefore subject to seizure and forfeiture under Title 18, U.S.C., Section 924(d)(1) and 18 U.S.C. § 3051(c).

31. In addition, I have probable cause to believe that NHM CO has in its possession records reflecting a violation of foregoing sections including, but not limited to, records reflecting the acquisition and disposition of firearms as more particularly set forth in Attachment C. I further have probable cause to believe that NHM CO has in its possession other evidence, as described in

Attachments B and C of this affidavit, of violations of the afore-mentioned statutes.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this day of March 22, 2005, at Sacramento, California.

Donna M. Hauser
Special Agent, ATF


Approved as to Form:

R STEVEN LAPHAM
COURTNEY J. LINN
Assistant U.S. Attorneys

Sworn and subscribed to before me this 22nd day of March 2005.

HON. KIMBERLY J. MUELLER
United States Magistrate Judge

11

## **ATTACHMENT A**

The premises 2215 J Street, Sacramento, California, are further described as a single-story business, being tan in color. On the front of the building, painted in large brown letters, is "OLD SACRAMENTO ARMOURY". Also painted on the front of the building is a large gray/blue colored revolver (handgun). To the immediate left of the painted revolver is a large metal (same color as building exterior) roll-up door. The entrance to the business is a glass door that is recessed behind the large metal roll-up door. Directly adjacent to the west, is a red single-story building. Directly adjacent to the east, is a two-story, light green apartment building. The business is located on the north side of J Street, between 22nd Street and 23rd Street, within the city and county of Sacramento, Eastern District of California.

## **ATTACHMENT B**

Items to be seized are described as follows: All Israel Military Industries receivers in various states of marking/assembly.

1

## ATTACHMENT C

A. All records related to the acquisition and disposition of firearms from 1999 to the present, including but not limited to the bound record of acquisition and disposition, sales invoices, purchase invoices, photocopies or other reproductions of federal firearms licenses (from receiving federal firearms licensees), records of importation (including ATF Forms 6 and 6A), correspondence from or to NHM CO related to the transfer of firearms, internal memoranda, and correspondence between the various licenses held at 2215 J Street, Sacramento, California. The term "records" as used above includes all computers and other programmable instruments capable of creating, storing or displaying the above records and documents, including, but not limited to: data storage devices, including tapes, hard disks, floppy disks, compact disks, laser disks, flash disks, magneto-optical disks, Bernoulli disks, SyQuest disks, and write-once read-many (WORM) disks; data processing devices, including microprocessors, random access memory (RAM) and read-only memory (ROM); data input and output devices, including tape and disk drives, keyboards, pointing devices, touch screens, pen tablets, styluses, scanners, digitizers, optical character readers, monitors, display screens, printers, plotters, microphones, and speakers; associated system equipment, including modems, acoustic couplers, infrared transceivers, network devices, system servers, circuit boards, ports, slots, sockets, switches, adapters, interfaces, buses, controllers, modules, expansion cards, connectors, cables, cords, amplifiers, surge suppressors, power directors, power supplies, AC/DC adapters, batteries, chargers, cases, docking stations, and port replicators; computer programs, including system programs and application programs; system and application documentation, including user's guides, instruction manuals, operating logs, computer literature and passwords.

Special Agents are authorized to remove any of the above described computer equipment and records and conduct a later search of these items at another location.

B. All Israel Military Industries receivers in various states of marking/assembly.